SHAUNA SNYDER, AS THE SPECIAL ADMINISTRATOR OF THE ESTATE OF DANIEL PATRICK LOVETT, DECEDENT, APPELLANT, *v.* JOSEPH VIANI, INDIVIDUALLY AND DBA JOE'S TAVERN; TOMMY JO MONTOYA; TAMMY ADAMS; MINERAL COUNTY SHERIFF'S OFFICE, A POLITICAL SUBDIVISION; JOHN MADRASO, JR., IN HIS OFFICIAL CAPACITY AS SHERIFF AND INDIVIDUALLY; JOHN LEONHARDT, IN HIS OFFICIAL CAPACITY AS SHERIFF AND INDIVIDUALLY, RESPONDENTS.

No. 23726

May 3, 1996                                    916 P.2d 170

*Peter Chase Neumann,* Reno, for Appellant.

*Erickson, Thorpe & Swainston,* Reno; *Bradley, Drendel & Jeanney,* Reno, for Respondents.

## OPINION

By the Court, YOUNG, J.:

The Nevada Supreme Court issued its opinion in this case on November 30, 1994, upholding our prior decisions that have refused to impose liability upon servers of alcoholic beverages for damage caused by patrons who subsequently use our highways absent legislation establishing such liability. JUSTICE ROBERT ROSE was part of the three-Justice majority; CHIEF JUSTICE STEFFEN and JUSTICE SPRINGER dissented.

On February 1, 1995, Shauna Snyder's new counsel filed a motion to disqualify JUSTICE ROSE pursuant to NRAP 35(a) on the ground that JUSTICE ROSE should not have participated in the decision because he owned a restaurant/bar in Clark County, Nevada, and this created a conflict of interest with the issue

decided. Snyder's motion also seeks vacation of the issued opinion and a rehearing before "non-disqualified" judges, pursuant to NRAP 40.

When a justice has participated in a case, NRAP 35 requires that a motion to disqualify must establish that it is timely filed and that the alleged disqualifying interest amounts to "fraud or like illegal conduct." Snyder and her attorney had actual and constructive knowledge of JUDGE ROSE's restaurant/bar ownership well prior to our decision in November, 1994 and Snyder waived any disqualification claim by not asserting it sooner. Further, Snyder's allegations, even if true, do not amount to "fraud or like illegal conduct" and therefore the grounds for her motion to disqualify are insufficient as a matter of law.

We also conclude that JUSTICE ROSE's ownership did not create a direct, ongoing pecuniary interest such that would disqualify him from participation in this case. Accordingly, we deny Snyder's motion to disqualify JUSTICE ROSE and her petition for rehearing.

## DISCUSSION

The threshold issue is whether Snyder had, as a matter of law, actual or constructive notice of JUSTICE ROSE's ownership of a restaurant/bar in Las Vegas prior to our decision in this case and is thereby precluded from now asserting this motion pursuant to NRAP 35. We answer this question in the affirmative.

### Actual notice of interest

In addition to the substantial information that clearly gave constructive notice to the public at large about JUSTICE ROSE's restaurant/bar ownership, the record establishes that Snyder's attorney had actual notice of ROSE's interest. In June 1994, Snyder's former attorney in the appeal of this case had a conversation with Clark Santini about this very case and ROSE's ownership of a bar. Santini, an experienced investigator by profession, had a detailed recollection of that conversation.[1]

---

[1]In Santini's affidavit, he stated:

The second was a case involving a minor who was served liquor at Joe Viani's bar and then killed himself and others in an automobile accident thereafter. McKenna indicated he had lost the case in district court but had appealed it to the Nevada Supreme Court. He indicated that he was uncertain about the Supreme Court result and elaborated. McKenna stated that he knew JUSTICE STEFFEN was a Mormon and always voted

While Snyder's former attorney initially denied having any knowledge of ROSE's restaurant/bar interest prior to the decision, he did not respond to Santini's allegations when given the opportunity, and Snyder argued only that notice to her former attorney is insufficient to bind her.

Snyder's claiming that her attorney's knowledge does not bind her is directly contrary to our holding in the *Ainsworth* case and in numerous additional cases we have decided in the past decade. *See, e.g.,* Stoecklein v. Johnson Electric, Inc., 109 Nev. 268, 273, 849 P.2d 305, 309 (1993); Arteaga v. Ibarra, 109 Nev. 772, 776-77, 858 P.2d 387, 390 (1993). Therefore, Snyder's former attorney's actual knowledge of ROSE's restaurant/bar ownership is imputed to Snyder. Since Snyder did not take any action to object to ROSE's sitting on this case on the basis of his restaurant/ bar ownership, those grounds for disqualification have been waived.

### Constructive notice of interest

This court has established that if a party or his/her attorney has constructive notice of a judge's interest or relationship before a case is decided and does not object, that conflict or relationship will be waived. Ainsworth v. Combined Ins. Co., 105 Nev. 237, 774 P.2d 1003 (1989). In that case, numerous conflicts or relationships of a former justice who authored an opinion were cited as grounds for a rehearing of the case, and this court stated what was sufficient, as a matter of law, to put the insurance company, Combined, and its attorneys on notice of an interest or relationship.

Combined alleged that the counsel for the winning party, Ainsworth, had assisted the former justice in a prior campaign and was also a close personal friend. After observing that allegations of bias in favor of or against an attorney for a litigant generally are not sufficient for disqualification of a judge, this court observed that Ainsworth's attorney's relationship with the campaign conducted years previous was "fully disclosed in numerous public, political advertisements and was well-known among members of the state bar long before this appeal was ever perfected." *Id.* at 261, 774 P.2d at 1020. The court determined

---

against the bars in these types of cases, but McKenna said he did not know how he would fare with JUSTICE ROSE because he knew JUSTICE ROSE owned a bar in Las Vegas. However, he gave me the impression that he did not necessarily think JUSTICE ROSE would be biased. It was unmistakable that Ken McKenna knew in June, 1994, that JUSTICE ROSE owned a bar in Las Vegas.

that Combined knew or should have known of this political relationship and stated:

> Well-reasoned authority supports a conclusion, however, that counsel, knowing facts assertively supportive of a motion for reconsideration, recusal or vacatur based upon charges of bias and impropriety, "may not lie in wait" and raise those allegations in a motion "only after learning the court's ruling on the merits."

*Id.* at 260, 774 P.2d at 1019 (quoting Phillips v. Amoco Oil Co., 799 F.2d 1464, 1472 (11th Cir. 1986), *cert. denied,* 481 U.S. 1016 (1987)).

Combined Insurance also claimed that the former justice had a close association with the Nevada Trial Lawyers Association (NTLA) and had been given an award by it the previous year, this being grounds for disqualification because NTLA had filed an amicus brief in the case and Ainsworth's attorney was prominent in the organization. However, this court concluded that some of the attorneys representing Combined were members of NTLA and presumably had knowledge of the award at the time it was conferred. The court also referred to several newspaper articles about the former justice's award and concluded that Combined's counsel "knew or had reason to know of the award prior to the issuance of this court's decision," and that "Combined's failure to tender a prompt objection constitutes a waiver of its right to raise the issue at this late date." *Ainsworth,* 105 Nev. at 263-64 n.17, 774 P.2d at 1022 n.17.

Combined also claimed that the former justice had an interest in a business venture with Ainsworth's counsel. However, the court stated that: "[I]t is clear from the record that such a relationship was revealed in a public notice published in Reno's largest newspaper of general circulation on four separate occasions." *Id.* at 270 n.22, 774 P.2d at 1026 n.22. After a review of all the evidence sufficient to provide actual or constructive knowledge of the interests or relationships of the former justice prior to the decision, this court concluded that the former justice did not have "*any direct, ongoing pecuniary interest* in the outcome of any litigation before this court," that the factual allegations supporting a rehearing were known or should have been known to Combined's counsel well before the decision, and that no rehearing was warranted because it was not established that the former justice "had any direct disqualifying interest in this litigation or that his impartiality toward the litigants might reasonably be questioned." *Id.* at 269, 270, 774 P.2d at 1026.

In numerous instances of claimed conflicts of interest, we held

in *Ainsworth* that newspaper articles, legal notices, or common knowledge provided actual or constructive knowledge to the litigant's attorney and precluded a challenge on those grounds after the issuance of the court's opinion. The information available to Snyder and her attorney of ROSE's restaurant/bar ownership prior to the decision in this case was far more extensive than any such information cited in the *Ainsworth* case. Specifically, there was abundant evidence of ROSE's restaurant/bar ownership presented throughout Nevada in the years prior to our decision, specifically including the following:

1.  More than a decade of application filings and hearing notices made by the Nevada Gaming Control Board and Commission concerning JUSTICE ROSE's ownership of a restaurant/bar with fifteen slot machines in Las Vegas, Nevada.

2.  A decade of applications, filings, and hearing notices before the Liquor and Gaming Control Board in Clark County, Las Vegas, and Henderson, Nevada, concerning JUSTICE ROSE's ownership of a restaurant/bar and fifteen slot machines.

3.  The listing of the business entity that owned the restaurant/ bar in JUSTICE ROSE's annual judicial disclosure reports for the years he has been a justice, most of the notices specifically describing the business as a restaurant/bar.

4.  Numerous newspaper articles about JUSTICE ROSE's ownership of a restaurant/bar that appeared when the yearly disclosure reports were filed and when there was any activity taken by the Nevada Gaming Control Board or Commission concerning JUSTICE ROSE's ownership.

5.  The enormous publicity given JUSTICE ROSE's restaurant/ bar ownership during the 1994 election. This included an entire month of television and radio commercials about his ownership. One radio commercial stated that JUSTICE ROSE "moonlights as a poolroom and tavern owner" and another made a very similar assertion. A television ad that ran extensively before the November 8, 1994 election stated that "ROSE operates a bar and pool hall in Las Vegas" and at the same time showed film of the tavern. Literally hundreds of radio and television commercials were broadcast throughout Nevada about JUSTICE ROSE's interest just a month prior to the decision in this case.

## NRAP 35

After the *Ainsworth* decision, this court adopted NRAP 35 to set forth the requirements a party must meet when attempting to disqualify a justice. A portion of the rule addressed the situation presented in the *Ainsworth* case.

> In no event will the supreme court deem timely any motion or charge seeking the disqualification or recusal of a justice

who has heard argument upon, or otherwise considered, any contested matter in the cause, except as to grounds based on fraud or like illegal conduct of which the challenging party had no notice until after the contested matter was considered.

NRAP 35(a).

The case of PETA v. Bobby Berosini, Ltd., 111 Nev. 431, 894 P.2d 337 (1995), was the first one to consider Rule 35 when a justice's disqualification was sought after an opinion had been rendered. In *PETA,* a limited exception was made to the requirement that a claim for disqualification is untimely after the opinion has been issued unless "fraud or like illegal conduct" is shown. The court determined that, in the interest of justice, PETA should not be precluded if there was no way that it could have known of the interest or association the judge had prior to the decision. *Id.* at 433 n.2, 894 P.2d at 338 n.2.

We feel this is an appropriate exception to the strict preclusion set forth in Rule 35, but it has no application in this case. We have set forth the facts that gave Snyder both actual and constructive knowledge of JUSTICE ROSE's interest, and a further exemption to Rule 35 is not warranted. Additionally, we would recommend that future exceptions to Rule 35 should be done by amendments to the rule rather than by court decision.

*No direct, ongoing interest*

The facts concerning JUSTICE ROSE's ownership of a restaurant/bar are not in dispute. He has had this interest prior to becoming a judge, and such ownership has been common knowledge in Nevada. In fact, JUSTICE ROSE participated in the case of Hinegardner v. Marcor Resorts, 108 Nev. 1091, 844 P.2d 800 (1992), that this court decided three years ago which presented the same issue as did this case, and no complaint about ROSE's participation was made.

It is obvious that JUSTICE ROSE had no interest in Joe Viani's tavern, and no lawsuits were pending that claimed liability against ROSE on the theory espoused by Snyder. In Goldman v. Bryan, 104 Nev. 644, 651, 764 P.2d 1296, 1300 (1988), we cited State v. Scarborough, 410 P.2d 732, 734 (N.M. 1966), with approval for the proposition that a judge's "disqualifying 'interest' must be a present interest in the outcome of the proceeding, 'not some indirect, remote, speculative, theoretical or possible interest.'" It is true that ROSE owned a restaurant/bar similar to that owned by Viani, but it has been held many times that a judge with an interest similar to that in litigation is not disqualified thereby. This principle was clearly stated in City of Valdosta v.

Singleton, 28 S.E.2d 759, 763 (Ga. 1944), in which the Georgia Supreme Court stated:

> [A] judge is not disqualified merely because of an interest in some abstract legal question that is presently involved and which may arise in some future litigation affecting him or his property rights . . . .

*See also* State v. Churchwell, 195 So. 2d 599, 600-01 (Fla. Dist. Ct. App. 1967). If this case had been decided in Snyder's favor, the decision would have had no economic impact on JUSTICE ROSE.

Further, JUSTICE ROSE's interest is not ongoing—he entered into a written contract to sell the restaurant/bar in July 1994, four months prior to the decision in this case. At the time the opinion was issued, the sale was in escrow awaiting only the final approval of the Nevada Gaming Control Board and Commission. Approval was given, and the sale was finalized in early 1995.

JUSTICE ROSE has stated that he has no feelings of bias toward or against any party in this litigation and that he believes he has and can be impartial to all concerned. This court has previously held that a judge's opinion as to his or her impartiality should be given substantial deference. In re Petition to Recall Dunleavy, 104 Nev. 784, 769 P.2d 1271 (1988). Given this deference and considering the undisputed facts and legal authority above-cited, we conclude that JUSTICE ROSE's ownership, as a matter of law, does not create a direct, ongoing pecuniary interest that would disqualify him from participation in this case or be a violation of the Nevada Code of Judicial Conduct.

Since Snyder's allegations present no legally cognizable grounds whatsoever supporting a reasonable inference of bias or impropriety, summary dismissal of her motion is warranted as a matter of law without any formal hearing. Ainsworth v. Combined Ins. Co., 105 Nev. 237, 270, 774 P.2d 1003, 1026 (1989); *Dunleavy,* 104 Nev. at 789, 769 P.2d at 1274. This rule of law was recently reaffirmed in Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 380, 873 P.2d 946 (1994). In that case, JUSTICES STEFFEN and SPRINGER joined in determining that a motion to disqualify them was untimely, without merit, and insufficient as a matter of law to warrant a formal hearing under NRS 1.225(4). *Id.* at 422-29, 873 P.2d at 972-77.

> Finally, the Commission contended that this court improperly refused to conduct a hearing on the motion for disqualification. *See* NRS 1.225(4) (hearing on a motion or charge for disqualification shall be had before the other justices of the supreme court). Not every motion for disqualification, however, rises to the level of a statutory "charge,"

which automatically calls for a formal hearing before unchallenged justices. For example, in the case of In re Petition to Recall Dunleavy, 104 Nev. 784, 789, 769 P.2d 1271, 1274 (1988), this court explained:

> [T]he statutory provisions and mechanisms providing for a judge's disqualification are not activated, and summary dismissal of the challenge is appropriate, where the challenge fails to allege legally cognizable grounds supporting a reasonable inference of bias or prejudice.

Similarly, in *Ainsworth,* 105 Nev. at 270-271, 774 P.2d at 1026, this court explained that because factual allegations raised in support of a motion to disqualify "present[ed] no legally competent grounds supporting a reasonable inference of bias . . . the hearing before unchallenged justices that is provided under NRS 1.225(4) [was] inapplicable." Therefore, in view of the legal insufficiency of the Commission's motion for disqualification, the Commission was not entitled to a hearing under NRS 1.225(4).

*Id.* at 428-29, 873 P.2d at 976-77.

*Petitioner's other contentions*

Snyder claims that this case presents a gaming issue and thus JUSTICE ROSE is precluded from participating in this case because of gaming Regulation No. 12. Regulation 12 requires any judge or justice holding a gaming license to refrain from participating in gaming-related matters. The record is uncontroverted that a gaming issue for a judge or justice has been narrowly construed and is one that involves the Gaming Control Board or Commission, its members or employees, or the enforcement or interpretation of Nevada gaming statutes.

The case before us does not involve any of these individuals or statutes. It is a case involving a fatal accident caused by a drunk driver whose estate Snyder now administers and a suit against a tavern asserting that it is responsible for the underaged drunk driver's death because it served him alcoholic beverages six hours before the accident. This is a case involving a fatal accident and the service of alcohol to a minor. It has nothing to do with gaming or the enforcement or interpretation of Nevada's gaming statutes. Accordingly, we reject Snyder's claim that JUSTICE ROSE should not participate in this case because it involves a gaming matter.

Snyder claims that a letter sent at the close of the 1994 election

campaign by four tavern owners or operators, one of whom worked for the bar owned by JUSTICE ROSE, to other tavern owners seeking their support for ROSE'S re-election was improper. We disagree. The letter was on stationery that contained the logo of the four taverns and was signed by each tavern owner or operator. It was not a letter or brochure that came from the ROSE campaign for re-election or on its stationery.

The tavern owners wrote the letter in response to numerous attacks by ROSE'S election opponent based on ROSE'S bar ownership. The letter made two basic points. First, that JUSTICE ROSE was a good justice who made sound decisions and was attempting to reform the Nevada court system. Second, that he understood Nevada and its gaming/liquor industry since he had held a liquor/gaming license for more than a decade. An appendix was attached to the letter summarizing three cases decided by the Nevada Supreme Court in which ROSE participated. One case concerned this court's established legal position that dram shop liability should be addressed by the Legislature and not enacted by an activist court. In that summary, it stated that ROSE believed in "strong but fair DUI enforcement."

This letter was sent out by individuals who were not part of JUSTICE ROSE'S campaign for re-election and did not represent that they were speaking for the justice. It was an interest group supporting a candidate and stating the reason for such support. The fact that a campaign manager approved the letter for its general content did not make it part of JUSTICE ROSE'S campaign. Further, a candidate for judicial office has always been permitted to state his or her background, legal record, and commitment to upholding the law. *Cf.* Nevada Code of Judicial Conduct §§ 5A(3)(d)(i), 5A(3)(e), and 5C(2). Although not called upon to decide this issue because the statements were made by an independent group and not by JUSTICE ROSE, it would appear that any judge or justice should be permitted to state what he or she has done to improve the court system and the decisions he or she has made that are part of the record.

We conclude that Snyder's other claims are also without merit.

## CONCLUSION

Snyder, through knowledge imputed to her by what her former counsel knew, had actual knowledge of JUSTICE ROSE'S ownership of a restaurant/bar and also constructive notice of that interest. Pursuant to NRAP 35(a), Snyder is precluded from raising this claim because it was not asserted prior to this court's opinion.

The undisputed facts also show that the Justice's ownership did

not create a direct pecuniary interest in this case and such ownership was in the final stages of being sold. Accordingly, the motion to disqualify and the petition for rehearing are denied, along with all other requests for relief asserted by Snyder.

SHEARING, and ROSE, JJ., concur.

ROSE, J., concurring:

I concur to address the dissent, which is both hypocritical and misleading.

The fact that I owned a bar-restaurant in Las Vegas has been public knowledge since I joined this court seven years ago. The business has been listed in my yearly disclosure statement filed at the court, and I have talked many times with JUSTICES STEFFEN and SPRINGER about the bar and my attempts to sell it. When I voted at conference on this case and on Hinegardner v. Marcor Resorts, 108 Nev. 1091, 844 P.2d 800 (1992), neither JUSTICE STEFFEN nor JUSTICE SPRINGER made a whimper of any concern—as a judge is required to do if he or she observes what he or she believes is improper conduct by a fellow judge. *See* Nevada Code of Judicial Conduct, § 3D(1). If there was an authentic objection, it should have been voiced at that time.

JUSTICES STEFFEN and SPRINGER also express concern with my participation in this motion to disqualify, but they did the very same thing in the Whitehead case in which they were extremely interested. Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 380, 422-29, 873 P.2d 946, 972-77 (1994) (*Whitehead II*). The Attorney General filed a motion to disqualify JUSTICES STEFFEN and SPRINGER, claiming that they had a disqualifying personal and financial interest because of a letter written by the justices' attorney to the Las Vegas Review-Journal. As the majority explains, JUSTICES STEFFEN and SPRINGER participated in the dismissal of the motion to disqualify lodged against them, stating that not every motion for disqualification "rises to the level of a statutory 'charge,' which automatically calls for a formal hearing before unchallenged justices." *Id.* at 429, 873 P.2d at 976.

This case presents the same situation as in *Whitehead II*, but this time the motion is filed against me, and JUSTICES STEFFEN and SPRINGER now want to change the rules. What is good for the goose should be good for the gander.

In the dissents, CHIEF JUSTICE STEFFEN and JUSTICE SPRINGER claim that they did not vote on their own disqualification, but one need only review pages 422-30 of the *Whitehead II* decision to see that JUSTICES STEFFEN and SPRINGER clearly considered the motion to disqualify them, determined that they could participate and then denied the challenge. *Id.* at 422-30, 873 P.2d at 972-77.

The concurrence signatures of JUSTICES STEFFEN and SPRINGER appear on page 430. The Justices' statements that they did not vote on their own disqualification are a reflection of the accuracy of many of the statements in their dissents.

When a judge is charged with a disqualifying interest, it must be established that the interest is a direct substantial ongoing financial or personal interest, and Snyder has totally failed to do that. A decision adverse to Viani's tavern would not have affected me personally or financially. At the time of the decision, my business had been sold, and the transfer was awaiting gaming board and commission approval. It was also subject to the control of the United States Bankruptcy Court. When I voted in the Viani case, there was no direct ongoing interest for me with my bar business. The dissent seems to acknowledge this, but states that it is possible that I will retake the bar business if not paid the remaining sales price. This is rank speculation; and if this remote eventuality occurred, I would simply resell the property.

Not being able to establish a disqualifying ongoing direct interest when the Viani case was decided, the dissent refers back to the 1992 *Hinegardner* decision and claims I improperly voted on that case. That vote is not the subject of the motion to disqualify, and the dissent's criticism also misses the mark in claiming that the *Hinegardner* decision lessened my insurance costs. I have always carried full high limits insurance coverage, including a one million dollar personal liability insurance umbrella. My insurance costs would have remained the same with or without a dram shop act. However, this may not be true for other taverns or casinos.

The letter written by my bar manager and three of his bar manager/owner friends was an action taken independent of my campaign for reelection. I wrote no part of the letter, did not approve it in advance, and only gave three case citations which that constituency might have approved. I have always thought that a judge could refer to his record in a campaign and that he was not responsible for the statements and actions of third parties. The dissent states that this letter was "on behalf of the campaign," and that is simply false. It also claims that I fulfilled a campaign promise made in this letter in voting on the underlying case, but any promise made in the letter by the bar owners/managers was not a promise made by me, and I certainly did not feel bound by the letter.

I participate in the motion to disqualify me because, as a matter of law, the motion was not timely filed and does not establish "fraud or like illegal conduct" on my part, as is required by NRAP 35. Even before the stringent requirements of NRAP 35 had been promulgated, JUSTICES STEFFEN and SPRINGER decided

that a motion to disqualify former JUSTICE ELMER GUNDERSON was not timely filed because prior to the court decision information had been in the newspapers about GUNDERSON's asserted disqualifying interests. Ainsworth v. Combined Ins. Co., 105 Nev. 237, 774 P.2d 1003 (1989). They also decided that although GUNDERSON's own attorney, Laura FitzSimmons, was an attorney in the *Ainsworth* case, this was not a sufficient outside interest to merit disqualification of GUNDERSON. When you combine the *Ainsworth* decision with the *Whitehead II* decision, where JUSTICES SPRINGER and STEFFEN participated in dismissing the disqualification motion filed against them, and with NRAP 35, it is clear that, as a matter of law, the motion to disqualify me is not timely and is legally insufficient. I am using the same rules and reasoning JUSTICES STEFFEN and SPRINGER used to reject disqualification attempts filed against them and former JUSTICE ELMER GUNDERSON.

As a final point, it certainly appears that the dissent is motivated more by continuing animosity towards me rather than any reasonable belief that Snyder has any chance of taking her case to trial for the estate of a drunk driver who killed four people. For decades the law in Nevada has been that no such action lies because this court will not judicially enact a dram shop law. In 1995, the Legislature passed a law stating unequivocally that such actions will not lie against a purveyor of alcoholic beverages. NRS 41.1305. Since the law of this state is very clear that an action such as Snyder asserts will not be entertained by the courts, I can only think that the dissents' motivation is again to criticize and embarrass me.

STEFFEN, C. J., joined by SPRINGER, J., dissenting:

Respectfully, I dissent from the majority's conclusion that JUSTICE ROSE is qualified to sit on this case, and for that reason would vacate the court's opinion and grant rehearing with another judge sitting in the place of JUSTICE ROSE.

Canon 2 of the Nevada Code of Judicial Conduct states that "**[a] judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities**." In the Commentary to Canon 2, it notes that "[p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges. . . . The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired."

In order to demonstrate why I strongly believe JUSTICE ROSE is disqualified to sit on the instant case, I attach hereto as Exhibit A, a letter dated October 26, 1994, (hereafter "the letter") which

was signed by our colleague's bar manager, Steve McLaughlin, on behalf of JUSTICE ROSE's reelection campaign. JUSTICE ROSE was aware of the letter and even provided the case citations that it referenced. The letter, which notes that JUSTICE ROSE was one of the majority of three (thus the swing vote) in the case of Hinegardner v. Marcor Resorts, 108 Nev. 1091, 844 P.2d 800 (1992) (*Hinegardner* involved basically the same issue concerning the liability of negligent vendors of alcoholic beverages as the instant case), ends with the following portent, which JUSTICE ROSE fulfills by voting on the instant case: "Bob's election is a good bet—for you [the bars and commercial alcohol vendors of the state] and the State of Nevada. This is an important issue to each of our livelihoods."

The letter, which was signed by representatives of four commercial purveyors of alcoholic beverages, including JUSTICE ROSE's Sidelines Lounge and Restaurant, was directed to owners of similar establishments in an effort to secure campaign contributions for JUSTICE ROSE's reelection to this court. In referring to the *Hinegardner* case, the letter notes that:

> [T]he Nevada Supreme Court upheld the Nevada dram shop protection for bars and casinos by a 3-2 vote, even though the person, who later was involved in a serious automobile accident, was a minor. Bob [Rose] was in the majority. *Imagine the increased cost of insurance if all bars and restaurants were responsible for whatever injury a patron caused after leaving the establishment.*

(Emphasis added.)

I consider JUSTICE ROSE's participation in the *Hinegardner* case as inappropriate as the instant case, but his participation was not challenged in *Hinegardner*. When *Hinegardner* was decided by the margin of JUSTICE ROSE's vote, our colleague benefitted directly from avoiding the necessity of paying for "the increased cost of insurance" noted in the letter. He also benefitted from his later sale of the Sidelines Lounge and Restaurant because the profitability of the business would have reflected the lower insurance costs resulting from his vote in *Hinegardner*. Moreover, since he still holds a large, secured promissory note on his bar, there is the distinct possibility that he could reacquire ownership of the business without the increased insurance costs that a majority vote favoring Snyder in the instant case could produce.

The letter strongly demonstrates that JUSTICE ROSE's personal interest in minimizing insurance costs to his own business was far more than *de minimis*. Thus the letter's entreaty to "*[i]magine* the increased cost of insurance if all bars and restaurants were responsible for whatever injury a patron caused after leaving the

establishment.'' (Emphasis supplied.) Given the direct, substantial and personal interest that our bar-owning colleague had, and potentially still has, I consider it self-evident that he cannot sit on this case and avoid the appearance of impropriety that Canon 2 indicates he *must* avoid.

Moreover, I am of the opinion that the United States Supreme Court case of Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813 (1986), has direct application here. In *Lavoie,* the challenged justice of the Alabama Supreme Court had participated in deciding a case that established a rule of law that would prove beneficial to another case in which he was a litigant. As the Supreme Court noted, ''his [the challenged justice's] opinion for the Alabama Supreme Court had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case.'' In concluding that the challenged justice's participation constituted a violation of the appellant's right to due process, the *Lavoie* court vacated the judgment of the Supreme Court of Alabama. Other parallels exist between *Lavoie* and the instant case, viz, in both instances the challenged judge cast the deciding vote and wrote the opinion in the case. Concerning this state of affairs, the High Court wrote:

> [W]e are aware of no case, and none has been called to our attention, permitting a court's decision to stand when a disqualified judge casts the deciding vote. Here Justice Embry's vote was decisive in the 5-to-4 decision and he was the author of the court's opinion. Because of Justice Embry's leading role in the decision under review, we conclude that the ''appearance of justice'' will best be served by vacating the decision and remanding for further proceedings.

Interestingly, the settlement Justice Embry received in his own case amounted to the ''tidy sum'' of $30,000, which the Court determined to be sufficient, even minus any attorney's fee he may have had to pay, to establish the ''substantiality of his interest'' in the *Lavoie* appeal. I suggest that JUSTICE ROSE's pecuniary benefit from the *Hinegardner* decision and potentially from this decision could far exceed the amount of $30,000. Given the amount of annual cost of insurance savings, and the impact of those savings in determining a sales price for his bar and restaurant, it is not unlikely that the amount at stake here was substantially greater than in *Lavoie*.

The opinion written by JUSTICE ROSE and authored by JUSTICE YOUNG on behalf of the majority, declaring himself qualified to sit, is patently inappropriate. By his own act and vote, he fulfills a campaign promise and continues to minimize insurance costs to

bars and casinos. Moreover, he provides himself with the assurance that if the buyers of his bar default on their payments to him, he will reacquire his business without having to pay the increased insurance premiums that were of such concern in the letter soliciting funds for his reelection to the court.[1] Indeed, the impropriety of the majority's ruling appears compounded by the fact that the rule of law reaffirmed by this case is in clear opposition to that established by the overwhelming majority of courts across the nation which recognize the need to do something about the terrible cost in human lives that results from the presence of intoxicated drivers on our highways. Commercial vendors of alcoholic beverages in these other jurisdictions have survived, but in Nevada this court apparently places a higher value on minimizing insurance costs to bars and casinos than it does on human life.

For the reasons noted above, I am forced to separate myself from the ethical standards acceptable to my colleagues in the majority.[2] I therefore dissent.[3]

---

[1] Furthermore, if the buyers of our colleague's bar and restaurant do not default in their payments, JUSTICE ROSE will continue to reap a profit from his deciding vote in *Hinegardner* that provided a perceptibly more favorable historical expense of operating factor attributable to the lower insurance rate.

[2] It is unfortunate that my colleague, JUSTICE ROSE, is unable to evaluate this dissent in an objective, forthright manner. Instead, he attacks the dissent as "hypocritical and misleading." It is neither.

My colleague's allusion to hypocrisy has reference to JUSTICES STEFFEN and SPRINGER having assertedly participated in determining their own disqualification in the *Whitehead* case, claiming that they therefore "did the very same thing [as JUSTICE ROSE is doing here] in the Whitehead case in which they were extremely interested." He is wrong. In *Whitehead,* the actual substantive challenges to JUSTICES STEFFEN and SPRINGER were decided *only* by JUSTICE SHEARING, SR. JUSTICE ZENOFF, and District Judge Guy in orders filed with the court on January 31, 1994 and February 18, 1994, respectively. The latter order denied the third challenge to the two justices. The only participation the challenged justices were involved in regarding the issue of their disqualification is found in Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 380, 422-30, 873 P.2d 946, 972-77 (1994), where the court patiently again explained why there was no basis for disqualification *as ruled by Justice Shearing, Sr. Justice Zenoff and District Judge Guy.* Indeed, the referenced three justices, in their order of February 18, 1994, referenced the cited case issued the same day, and held that JUSTICES STEFFEN and SPRINGER had no personal financial interest in the outcome of the case and that there was no due process basis for challenging any justices' continued participation in the case.

Moreover, the nature of the challenge in *Whitehead* was entirely different than the instant case. The "financial interest" alluded to by JUSTICE ROSE and raised against JUSTICES STEFFEN and SPRINGER by the Attorney General was not only expressly eliminated by a waiver of liability by the two justices (as held in the February 18, 1994 order by the three other members of the court), but the Commission conceded that the two justices had no disqualifying financial interest in the outcome of the *Whitehead* litigation. It is also

worthy of emphasis that unlike here, neither JUSTICE STEFFEN nor JUSTICE SPRINGER was the "swing vote" on any aspect of the issue of disqualification; they simply did not participate in determining the issue concerning their qualification to sit in the *Whitehead* case. Finally, unlike the instant case, JUSTICES STEFFEN and SPRINGER were not "extremely interested" in the *Whitehead* case other than to see it through to an honorable conclusion as required by their oaths of judicial office. It is apparent here that irrespective of actual intent, JUSTICE ROSE is fulfilling the promise of the campaign letter sent out on his behalf to raise campaign funds. JUSTICE ROSE provided to the author of the letter the citation to the *Hinegardner* case, cited in the letter as an example of how he looks out for the interests of bars and saloons.

My colleague also advances the novel proposition that I should have "whimpered" at his participation in *Hinegardner* if I entertained thoughts of impropriety over his sitting on the court. To my knowledge, a judge is on his honor and oath to recuse himself if there is a disqualifying bias. The members of the court have been under no obligation, and indeed could not be without a legion of full-time investigators, to determine whether an unchallenged justice is sitting on a case improperly. The question now raised with respect to *Hinegardner* is brought into sharp focus by the present case, and the fact that JUSTICE ROSE gave the *Hinegardner* cite to one or more persons for use in his reelection campaign.

Finally, JUSTICE ROSE indicates that the dissent is misleading because (at least in part) I stated that the [Exhibit A] "letter was 'on behalf of the campaign,' and that is simply false." I leave it to the reader to determine whether the letter is on behalf of JUSTICE ROSE's reelection campaign. Unless my senses have been terribly dulled, it appears that the letter was sent for the express and singular purpose of soliciting funds for none other than JUSTICE ROSE in his reelection campaign, and that the letter indicates how the prospective contributors will be rewarded by helping to reelect "Bob" to the court. If JUSTICE ROSE can advise me on whose behalf the letter was sent other than his own, I will be happy to consider any modification necessitated by the facts.

This dissent, if embarrassing to my colleague, has such an effect only because of the facts surrounding the question of his qualification to sit. I did not create the facts, and the reasons expressed concerning the propriety of his qualification to sit are forthright and in no sense an exercise created to either "criticize or embarrass" my colleague. Indeed, I truly regret the necessity of having to write this dissent. Moreover, the fact that JUSTICE ROSE is the "swing vote" on the matter of his own disqualification represents a factor or condition with which he is comfortable. I am not.

Giving my colleague the benefit of all doubt as to whether he is able to hold the balance nice, true and clear in this case, I simply return to Canon 2 of the Nevada Code of Judicial Conduct and ask the readers whether, in their view, the facts described herein create an appearance free of impropriety.

[3]I also note the possibility that the majority's decision, as per *Lavoie,* could later be subject to vacation under a due process challenge stemming from JUSTICE ROSE's clear interest in the outcome of this case. Whether finality will therefore be achieved by the majority's ruling is more than slightly problematical.

## EXHIBIT A

   

Dear Colleague,                                    October 26, 1994

We have joined together to write this letter to you because we feel that the information we have to give you is of the utmost importance to our businesses.

This letter is to recommend Chief Justice Bob Rose for election to a second term on the Nevada Supreme Court. We have known Bob for years and think he has earned the right to a second term.

First, he has proven to be an excellent Justice. He is a tireless public servant, and his decisions have been logical and sound. He is also fighting to reform the entire court system to make it more efficient, accessible, and user-friendly.

Second, Bob understands the gaming-liquor industry because he has held a limited gaming and liquor license for more than ten years. He well knows the benefits and problems of these privileged licenses—the burdens of heavy regulation and that the difference between a profit and a loss is often a matter of a few percentage points. A summary of a few of the major cases reflecting his sensitivity to our industry is enclosed—please read them.

What we all need to realize is how big of a part the Supreme Court / Justice Rose plays in setting of precedents that end up making the rules that we as business people have to live by. This includes handling of cases dealing with SIIS, State Unemployment Taxes, State and local gaming and liquor regulations, firing at will, liability cases that effect our insurance, etc. — *All of which effect us*

We ask for your support for Justice Bob Rose this year and hopefully a campaign contribution. If all of us gave $100.00 to the campaign, it would probably ensure his victory. Campaign contributions should be make out to Nevadans for Justice Rose and sent to 631 No. Stephanie St., #187, Henderson, Nevada 89014.

Bob's election is a good bet—for you and the State of Nevada. This is an important issue to each of our livelihoods.

Sincerely yours,

Sal's                                              Kurt's Backstop BC

Salvatore J. Cammarano                             Kurt Erick

Stage Door Casino                                  Sidelines

Randy Markin                                       Steve McLaughlin

\* \* \*

In Hinegardner v. Marcor Resorts, 108 Nev. 1091, 844 P.2d 800 (1992), the Nevada Supreme Court upheld the Nevada dram shop protection for bars and casinos by a 3-2 vote, even though the person, who later was involved in a serious automobile accident, was a minor. Bob was in the majority. Imagine the increased cost ·of insurance if all bars and restaurants were responsible for whatever injury a patron caused after leaving the establishment.

Palmer v. Del Webb's High Sierra, 108 Nev. 673, 838 P.2d 435 (1992), the Nevada Supreme Court held that a worker's injury from cigarette smoke allegedly acquired in a casino-bar was not an occupational disease for the purposes of SIIS benefits. If the Nevada Supreme Court had held otherwise, the additional cost and the raise in everyone's premiums might have destroyed an already shaky system.

Chief Justice Rose believes in strong but fair DUI enforcement. He also believes that a person accused of a DUI should be in actual control of the vehicle and not just sleeping in the car. "For the reasons stated, I believe that Leanette Isom, sound asleep on the front seat of a vehicle parked in a vacant lot of a closed business, was not in actual physical control of the vehicle when arrested. Accordingly, I dissent from the majority's opinion." Isom v. State, 105 Nev. 391, 396, 776 P.2d 543, 547 (1989).

*Sound Judgement—tough leadership—Robert E. Rose,*
*Nevada Supreme Court*

*Join us in helping this fine man get re-elected.*

SPRINGER, J., dissenting:

I join in JUSTICE STEFFEN's dissent, but file this separate dissent because I think more has to be said about JUSTICE ROSE's authoring[1] an opinion in which he decides a controversy relating to his own eligibility to sit in this case. I address the propriety of a supreme court justice's deciding matters relating to his or her own qualifications, with particular reference to the manner in which this point is argued by JUSTICE ROSE in his majority opinion and in his concurrence to the majority opinion.

JUSTICE ROSE is correct in identifying the "threshold issue" as being whether Ms. Snyder had "actual or constructive notice of JUSTICE ROSE's ownership of a restaurant/bar in Las Vegas prior to our decision in this case and is thereby precluded from now asserting this motion pursuant to NRAP 35." The thrust of JUSTICE ROSE's argument on this threshold issue is that it is too late for Ms. Snyder to raise the question of the Justice's bias because her former attorney knew about JUSTICE ROSE's tavern when this case was first decided.

Under PETA v. Bobby Berosini, Ltd., 111 Nev. 615, 895 P.2d 1269 (1995), the majority agrees, if Snyder did not know that ROSE was a tavern owner when the present case was decided against her, she is entitled to have her disqualification motion decided by the court, rather than having it rejected for technical reasons. JUSTICE ROSE argues against Ms. Snyder's position in two ways. First, he says that *everyone* knew that he owned the Sidelines Bar in Las Vegas and that the "public at large" had "constructive notice" about "JUSTICE ROSE's restaurant/bar ownership." Not content to rely entirely on the supposed com-

---

[1] The majority opinion in its present form was presented to me by JUSTICE ROSE, accompanied by the explanatory legend "From the Chambers of ROSE, J.," as were several previous drafts of the majority opinion. I complain in this dissent that JUSTICE ROSE should not be participating in an opinion (much less authoring an opinion) in which he makes such factual findings as "Snyder and her attorney had actual knowledge of JUDGE ROSE's restaurant/bar ownership well prior to our decision in November, 1994" and such legal conclusions as that JUSTICE ROSE's bar ownership "did not create a direct, ongoing pecuniary interest such that would disqualify him from participation in this case." These are hotly-disputed fact issues and legal issues that should be presented to an impartial tribunal rather than being decided by JUSTICE ROSE.

I would note that JUSTICE ROSE's majority opinion now appears on its face to have been authored by JUSTICE YOUNG; but this, of course, is impossible because the majority opinion is merely an almost-identical variant of an opinion first circulated by JUSTICE ROSE on December 13, 1995, accompanied by a memorandum in which JUSTICE ROSE states: "I circulate this draft denying the motion filed by the appellant." I object to JUSTICE ROSE's writing an opinion deciding conflicting factual and legal issues relating to his own qualifications, even as ghost-writer for JUSTICE YOUNG.

mon knowledge about his business interests (the argument being that Ms. Snyder must have known JUSTICE ROSE was a bar owner because she is part of the "public at large"), JUSTICE ROSE relies secondarily on his contention that Ms. Snyder's former attorney, Mr. McKenna, supposedly admitted to JUSTICE ROSE's campaign manager, Clark Santini, that he knew "that JUSTICE ROSE owned a bar in Las Vegas." Therefore, claims JUSTICE ROSE, Ms. Snyder "waived any disqualification claim by not asserting it sooner" and "her motion to disqualify [is] insufficient as a matter of law."

Ms. Snyder, of course, denies knowing about JUSTICE ROSE's bar interests until after the time that he cast his deciding vote in her case. JUSTICE ROSE's decision to deny Ms. Snyder's motion to disqualify him appears to rest primarily[2] on whether JUSTICE ROSE's campaign manager is telling the truth when he claims that Mr. McKenna told him that he knew JUSTICE ROSE owned a bar at the time he was deciding this bar-liability case. I suggest that some jurist other than JUSTICE ROSE ought to be deciding these fact-intensive issues.

Even if we were to accept JUSTICE ROSE's fact-finding that Ms. Snyder's former attorney knew that JUSTICE ROSE was a bar owner at the time JUSTICE ROSE decided this case against her, another critical *legal* issue remains, namely, whether Ms. Snyder's former attorney's knowledge, uncommunicated to Ms. Snyder, should be an absolute bar to Ms. Snyder's challenging JUSTICE ROSE's bias at this juncture. My own opinion is that it should not be. JUSTICE STEFFEN's opinion is that it should not be. The third, deciding judge of this issue should be some impartial jurist, and not JUSTICE ROSE.

Reverting to argument *ad hominem,* JUSTICE ROSE character-izes my objection to his participation in the decision to deny Ms. Snyder's challenge as being "hypocritical." JUSTICE ROSE offers two bases for branding me as a hypocrite, namely that I should have raised the issue at the time that he was voting in favor of bar interests and, further, that in another case I did the "very same thing" that he is now doing.

Putting aside the unseemliness of a supreme court justice, in published judicial opinion, calling his colleague a hypocrite, I answer his charges as follows: (1) I was under no duty to challenge JUSTICE ROSE's decision to cast the deciding vote in either this case or the *Hindgardner* case; (2) I have not sat in

---

[2] I reject out of hand and without discussion JUSTICE ROSE's contention that Ms. Snyder must have known about his bar ownership at the time this case was decided against her because the "public at large" knew that he was a bar-owner.

judgment of my own qualifications, as claimed by JUSTICE ROSE; and, even if JUSTICE ROSE's charge were true, this would not justify his being the deciding vote in denying Ms. Snyder's challenge of his impartiality in cases involving bars and taverns.

JUSTICE ROSE remarks that when he cast the deciding vote in this case, I did not, at our decision conference, make "a whimper of any concern." The reason that I did not whimper is that I have been unable to predict whether JUSTICE ROSE is going to disqualify himself in bar and casino cases. To his credit, I must say that in most bar and casino cases JUSTICE ROSE does disqualify himself. Once in while, however, unpredictably, he will sit on one of these cases. (For example: Trump v. District Court, 109 Nev. 687, 857 P.2d 740 (1993)). I know of nothing in the Code of Judicial Conduct that would require me to monitor JUSTICE ROSE's decisions to sit or not to sit in any given case.

With regard to JUSTICE ROSE's charge that I did the same, unacceptable thing that he is doing, I would first say that if I had sat in judgment of a challenge of my own qualifications, it would have been wrong for me to do so. The fact of the matter is that I did not[3]; but, if I had done so, this certainly would not provide justification for JUSTICE ROSE's doing so.

Because I disagree with his insistence upon sitting in judgment on this motion to disqualify him, JUSTICE ROSE calls me a hypocrite and imputes bad motives to me for filing this dissent. I am saddened that JUSTICE ROSE would make an embarrassing spectacle out of what seems to me to be a matter that is almost beyond dispute, namely that a supreme court justice should not be passing judgment on factual and legal issues that bear on his own eligibility to sit in a case.

---

[3]JUSTICE ROSE claims that in the *Whitehead* case I did the same thing that he is now trying to do—to pass judgment on my own qualifications. This is not true. When a challenge to my qualifications was filed in the *Whitehead* case, I immediately withdrew, and the motion was submitted to and decided by the remaining members of the court (JUSTICE SHEARING, SENIOR JUSTICE ZENOFF and District Judge Guy). I will not take the time to recount the tortured history in *Whitehead* of the challenges that had "been improperly tendered . . . for a serial, fourth time." Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 380, 422, 873 P.2d 946, 972 (1994). The majority recognizes that my participation in the various *Whitehead* opinions did not touch on my own qualifications to sit but, at most, *after the motions had been decided* by the other three members of the court, to rule that, based on the court's prior ruling on the "legal insufficiency" of the motions to disqualify, the "Commission was not entitled to a hearing" on the already-decided motions. (Majority Opinion at 8). If this is the "same thing" as JUSTICE ROSE's ruling that his campaign manager's statements are true and ruling that he had no pecuniary interest in this case, this still would not justify JUSTICE ROSE's ruling to reject Ms. Snyder's challenge to his qualifications to decide her case.